**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Terry Payne, | ) | No. CV-08-1753-PHX-LOA |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Michael J. Astrue, Commissioner, Social Security Administration, | ) | |
| Defendant. | ) | |

Plaintiff Terry Payne brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the Commissioner's final decision denying her application for disability insurance benefits. All parties have consented in writing to magistrate-judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1). (docket # 11) In accordance with Local Rule ("LRCiv") 16.1, Plaintiff has filed an Opening Brief, to which Defendant has responded, and Plaintiff has replied. (docket ## 19, 25, 31) Neither party has requested oral argument, and the Court finds this matter suitable for resolution on the pleadings. LRCiv 16.1(e). As set forth below, the Court affirms the Commissioner's decision.

**I. Procedural History**

On September 12, 2003, Plaintiff filed an application for disability and disability insurance benefits, alleging an onset date of December 5, 2002. (Tr. 136, 155) Claimant was found disabled as of March 1, 2004 in a reconsideration determination, dated July 29, 2004. (Tr. 22) Thereafter, Plaintiff filed a written request for a hearing, requesting an earlier onset

date. (Tr. 22)  On August 10, 2006, a hearing was held before Administrative Law Judge ("ALJ") Joan Knight. (Tr. 22)  Plaintiff, represented by counsel, appeared and testified.  A vocational expert appeared and was prepared to testify.  (Tr. 22, 98)  Plaintiff was ordered to undergo a consultative psychological evaluation, which was performed.  (Tr. 22)  A supplemental hearing was held before ALJ Knight on December 14, 2006.  (Tr. 22, 55)  Plaintiff appeared and testified, again represented by counsel.  Also appearing and testifying were Dr. David J. McIntyre, a medical expert, and David A. Janus, a vocational expert.  (Tr. 22)  The ALJ also considered the December 14, 2006 letter submitted by Plaintiff's counsel.  (Tr. 22)

On March 6, 2007, the ALJ issued a Notice of Decision - Partially Favorable, finding Plaintiff was not under a disability prior to March 1, 2004, but that Plaintiff was disabled as of March 1, 2004 continuing through the date of decision.  (Tr. 18, 22-23)  The ALJ's decision became the final decision of the Commissioner on July 30, 2008, when the Social Security Appeals Council denied Plaintiff's May 4, 2007 request for review. (Tr. 6-8, 22)

Having exhausted the administrative review process, Plaintiff appealed the Commissioner's final determination to this Court pursuant to 42 U.S.C. § 405(g) by filing a timely Complaint.  (docket # 1)  Plaintiff subsequently filed an Opening Brief.  (docket # 19)  The Commissioner has filed a response, docket # 25, to which Plaintiff has replied, docket # 31.  Accordingly, this matter is ripe for ruling.

**II.  Standard of Review**

Congress has provided a limited scope of judicial review of a Commissioner's decision.  42 U.S.C. § 405(g).  This Court must affirm the Commissioner's decision, made through an ALJ, when the determination is supported by substantial evidence and is free from reversible legal error. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1985); *Smolen v. Chater*, 80 F.3d 1273, 1279  (9th Cir. 1996); *Marcia v. Sullivan*, 900 F.2d 172, 174 (9th Cir. 1990).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance. *McAllister v. Sullivan*, 888 F.2d 599, 601-02 (9th Cir. 1989).  Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support

a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006). On review, a district court considers the record as a whole, "weighing both the evidence that supports and that which detracts from the ALJ's conclusions," *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998), and "may not affirm simply by isolating a specific quantum of supporting evidence." *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989) (internal quotation marks omitted).

It is the role of ALJ, not this Court, to resolve conflicts in the evidence, determine credibility, and resolve ambiguities. *Tommasetti v. Astrue,* 533 F.3d 1035, 1041-42 (9th Cir. 2008) (stating that the "ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence."); *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005) (stating that "[w]here evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.") (citation omitted). If sufficient evidence supports the administrative finding, or if there is conflicting evidence that will support a finding of either disability or non-disability, the finding of the Commissioner is conclusive. *Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990); *Sprague v. Bowen*, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

The Court will first discuss the evidence in the record, the administrative hearing, and the ALJ's findings and will then proceed to the issues raised by Plaintiff.

**III.  Evidence**

The record contains the following evidence regarding Plaintiff's claim that she is unable to work due to anxiety and depression prior to March 1, 2004.  (Tr. 23)

**A.  Medical Evidence Prior to Date (March 1, 2004) ALJ finds Disability**

On November 7, 2002, Plaintiff received treatment from Dr. Oide for numbness in both arms.   She also reported chronic anxiety with recent exacerbation.  Dr. Oide diagnosed joint pain, possible rheumatoid arthritis, and hepatitis C.  (Tr. 463-64, 466)  Also on November 7, 2002, Plaintiff received x-rays of both hands to rule out rheumatoid arthritis.  The x-ray of Plaintiff's right hand revealed a "small bony spur at the

waist of the scaphoid bone." (Tr. 476) The findings noted "no definite indication of rheumatoid arthritis." (Tr. 476) The X-ray of Plaintiff's left hand revealed a "small cyst v. erosion at the proximal pole of the scaphoid bone." (Tr. 477) The findings further noted that "the rest of the joint spaces within the [left] hand and wrist are unremarkable in appearance without definite indication of rheumatoid changes." (Tr. 477)

On November 21, 2002, Plaintiff saw Dr. Dana J. Miller-Blair for a consultative examination regarding pain and tingling in her hands and elbows. (Tr. 459) Plaintiff reported difficulty sleeping through the night because she is frequently awakened by pain and stiffness in her hands. Plaintiff reported pain in her left ankle attributable to a historical fractured left ankle that was repaired with plates, screws, and pins. A physical examination revealed "slightly erythematous and puffy skin overlying the distal phalanges." (Tr. 459) Dr. Miller-Blair also noted "tenderness in both wrists with range of motion." Laboratory tests showed a rheumatoid factor of 39 (the normal range is 0-14) and hepatitis C. (Tr. 459, 220) Dr. Miller-Blair prescribed prednisone, 10 mg daily. (Tr. 459-60)

On January 5, 2003, Plaintiff was treated for pain and swelling of her hands, rheumatoid arthritis, and peripheral neuropathy. (Tr. 454) A physical examination revealed a mild increase in warmth of the hands and decreased range of motion of all fingers and wrist joints due to pain. The attending physician noted that Plaintiff was unable to work through January 8, 2003. (Tr. 457)

In April 2003, Plaintiff began seeing Natividad Verdejo-Perez, M.D., a primary care physician. (Tr. 390) On April 16, 2003, Dr. Verdejo-Perez treated Plaintiff for joint pain and swelling of her hands. Dr. Verdejo-Perez prescribed Vicadin and Naproxen. (Tr. 390)

On June 3, 2003, Plaintiff had a follow-up visit with Dr. Verdejo-Perez for swelling in her hands and pain in the arms and hands. Dr. Verdejo-Perez referred Plaintiff to a rheumatologist. (Tr. 389)

On referral from Dr. Verdejo-Perez, on June 30, 2003, Plaintiff was treated by

Oscar Gluck, M.D., at the Arizona Rheumatology Center.  Plaintiff reported stiffness and swelling in her hands, wrists, shoulders, knees, and ankles dating back to 1996 .  (Tr. 215-16)  Plaintiff reported current "difficulty dressing herself, getting in and out of bed, and walking outdoors."  (Tr. 215)  A physical examination revealed "puffy legs," "sensitivity of the digits," and "pain in the fingers, hands, elbows, hips, feet, wrists, knees, and cervical spine."  (Tr. 216)  Dr. Gluck diagnosed hepatitis C and "inflammatory arthritis due to hepatitis C, probably rheumatoid arthritis."  Dr. Gluck adjusted Plaintiff's medication and prescribed blood work and x-rays.  (Tr. 212-217)

On July 7, 2003, Plaintiff obtained x-rays of her hands and feet.  The x-ray of Plaintiff's left hand revealed a "small cyst . . . in the proximal pole of the scaphoid."  (Tr. 223)  The findings for the left hand indicated that "joint spaces are well maintained.  There are no erosive changes.  No joint swelling is seen."  (Tr. 223)  The summary of the x-ray of Plaintiff's right hand indicated "minimal chondrocalcinosis in the radioscaphoid region versus an old avulsion injury.  Otherwise negative hand."  (Tr. 223)  The x-ray of the right foot revealed "minimal degenerative changes of the talonavicular joint."  (Tr. 223-224)  X-rays of Plaintiff's left foot were normal.  (Tr. 224)

On July 21, 2003, Plaintiff was again seen at the Arizona Rheumatology Center by Physician Assistant (P.A.) Scott F. Brown and Dr. Gluck.  She continued to complain of "pain, stiffness, and swelling in her hands and feet."  (Tr. 213)  The examiner, P.A. Scott Brown, noted that Prednisone did not provide effective relief for Plaintiff's symptoms.  (Tr. 213)  Upon physical examination, P.A. Scott Brown noted "mild nontender synovitis" in the wrists, metacarpophalangeal joints ("MCPs") and proximal interphalangeal joints ("PIPs"), as well as in the ankles and MTP's.  The examiner further noted "minimal synovitis" in the knees, and that Plaintiff had a weak grip bilaterally.  (Tr. 213)  A review of recent lab work revealed low hemoglobin, elevated CRP, "low positive" rheumatoid factor at 22, and hepatitis C.  (*Id.*)  Upon review of the July 7, 2003 x-rays, P.A. Scott Brown noted "a small cyst in the left hand at the proximal pole of the scaphoid," and "otherwise no erosive changes."  (Tr. 213)  After consult-

ing with Dr. Gluck, Plaintiff was diagnosed as seropositive rhematoid arthritis with a history of hepatis C. (Tr. 213-14)

On September 4, 2003, Dr. Verdejo-Perez treated Plaintiff for back pain, joint pain, and "all over" soreness. Dr. Verdejo-Perez diagnosed rheumatoid arthritis, carpal tunnel syndrome, hepatitis C, and "depression." (Tr. 387) Dr. Verdejo-Perez prescribed several medications. (Tr. 387)

Plaintiff was unable to fill her prescriptions because her "AHCCCS" had expired. (Tr. 238) Thus, that same day - September 4, 2003, Plaintiff went to the emergency room at Chandler Regional Hospital, hoping to receive pain medication for painful joints, left flank pain, numbness in the right arm, and all over pain. (Tr. 226, 238) A physical examination revealed joint stiffness, with "slight swelling" at all joints, mainly in the wrists, elbows, knees, and ankles. (Tr. 236) Plaintiff also had tenderness to palpation over most of the upper extremity joints. (Tr. 38) The examining physician noted that Plaintiff ambulated with a slow, cautious gait. (Tr. 228) Plaintiff was diagnosed with "exacerbation of rheumatoid arthritis" and was advised to obtain follow-up treatment with her regular doctor. (Tr. 226-239)

On September 10, 2003, Dr. Verdejo-Perez completed a "medical assessment of disability and unemployment" form, opining that due to rheumatoid arthritis, Plaintiff was unable to perform any substantially gainful employment. (Tr. 382)

On October 10, 2003, Plaintiff completed an "Activities of Daily Living Questionnaire" for the Department of Economic Security. (Tr. 166) Plaintiff reported staying home all day due to pain and fatigue from rheumatoid arthritis, carpal tunnel syndrome, and hepatitis C. (Tr. 166-169) She reported that she was living with LaTayna Robbins. (Tr. 167) Plaintiff indicated that she had difficulty "moving around" and sleeping at night, had "severe pain" bending her fingers, and had "problems" lifting her arms. (Tr. 166) She also reported difficulty brushing her teeth and hair, buttoning and zipping clothing, putting on shoes, and holding or grabbing objects. (Tr. 166) She indicated that she no longer visits with friends or participates in sports, but spends most of

her time watching television. (Tr. 166-169) Plaintiff concluded that she "knew in 1995 that something was wrong" and that she had "RA" that is "now . . . a painful chronic disease." (Tr. 168)

On January 12, 2004, Malcolm McPhee, M.D., conducted a consultative examination of Plaintiff for the Department of Economic Security. (Tr. 242) Dr. McPhee noted that Plaintiff reported suffering from rheumatoid arthritis, hepatitis C, carpal tunnel syndrome, and ankle problems. (Tr. 242) She also reported that in 1992, she fractured her left ankle "and had an open reduction internal fixation." (Tr. 242) Plaintiff reported continued pain in her left ankle and brought x-rays which showed loosening of the hardware. (*Id*.) Plaintiff stated that she was diagnosed with rheumatoid arthritis in 1995 and has experienced pain in all of her joints since that time. (*Id*.) Dr. McPhee further noted Plaintiff's complaints of a painful low back and painful feet.

Dr. McPhee noted that x-rays of Plaintiff's hands showed no evidence of rheumatoid arthritis. (Tr. 242) Upon physical examination, Dr. McPhee noted that Plaintiff "tended to moan, groan, and grimace throughout the examination seemingly out of proportion to the gentle procedures of the examination." (Tr. 242) Plaintiff walked with a cane in her right hand. Dr. McPhee indicated that Plaintiff "refused to participate in some of the examination procedures" including, "standing on her heels and on her toes," squatting, and hopping. (Tr. 242-43) Plaintiff had her mother remove her shoes and socks, and Plaintiff removed her wrist splints herself. (Tr. 243) Dr. McPhee noted palpable tenderness in both upper trapezius muscles and both lumbar paraspinal muscles. Dr. McPhee noted that "[m]anual muscle testing showed a tendency for [Plaintiff] to give away but [Dr. McPhee] was not convinced to any focal motor weakness." (Tr. 243) Dr. McPhee noted "no evidence of swelling or redness of the joints [of Plaintiff's hands] or other evidence of synovitis." (Tr. 243) Dr. McPhee also noted that Plaintiff "was able to make a full fist." (Tr. 243) Dr. McPhee further noted that Plaintiff's knees "showed normal range of motion and no joint effusion or instability," and that Plaintiff "had normal range of motion in all other joints tested." (Tr. 243)

Dr. McPhee diagnosed "myofascial tenderness of the upper and lower back," "hepatitis C," and "arthralgias of multiple joints, both hands without swelling, redness or deformities." (Tr. 243)  Dr. McPhee opined that, based on the history and physical examination, and review of available records, x-rays, and laboratory studies, in an eight-hour day, Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, stand or walk at least two hours of an eight-hour workday, and sit for 6 hours of an eight-hour workday with the usual rest breaks. (Tr. 243-44)  Mr. McPhee opined that Plaintiff "would be limited in upper extremity duties [and] would have difficulty climbing because of her left ankle pain."  (Tr. 244)

**B.  Medical Evidence After March 1, 2004**

In early 2004, Dr. Verdejo-Perez referred Plaintiff for x-rays.  Results of x-rays of Plaintiff's left hand taken on March 31, 2004 were within normal limits and showed "no subluxation, degenerative change or bone erosion." (Tr. 397)  X-rays of Plaintiff's right hand taken on March 31, 2004 showed "mild degenerative changes involving the radiocarpal compartment." (Tr. 396)

In April 2004, Plaintiff had two surgical procedures on her cervical spine - anterior and posterior cervical decompression and fixations. (Tr. 338-345)  On May 12, 2004, Dr. Verdejo-Perez saw Plaintiff following surgery.  Dr. Verdejo-Perez noted that Plaintiff "had complete relief of her left arm pain, but she continues to experience a moderate amount of neck pain as well as pain in her left supraclavicular region." (Tr. 338)  Dr. Verdejo-Perez reported that Plaintiff's wounds were "well-healed," her motor strength had returned, and her balance was good. (Tr. 338)

On June 1, 2004, James Huddleston, Ph.D., performed a psychological evaluation of Plaintiff in conjunction with her pending claim through the Arizona Department of Economic Security. (Tr. 22, 331)  Dr. Huddleston noted that Plaintiff shuffled when she walked, used a walker, and appeared to be in physical pain. (Tr. 331)  He noted Plaintiff reported having "felt significantly depressed for much of the past year." (Tr. 331)  She also reported that "in past years she had been a very happy and outgoing

- 8 -

person." (Tr. 331)   She reported a recent loss of appetite, and that her social functioning had "diminished significantly in recent months." (Tr. 332)  Dr. Huddleston diagnosed major depressive disorder, severe, without psychotic features, and pain disorder associat-ed with psychological factors and a general medical condition.  (Tr. 332)  Dr. Huddleston opined that Plaintiff's major depressive disorder had "developed in reaction to difficult life circumstances and ongoing physical pain."  (Tr. 332)  Dr. Huddleston opined that Plaintiff was incapable of performing even simple repetitive work tasks on a sustain-ed basis without instructions.  (Tr. 333)

### C. Hearing Testimony and Commissioner's Findings

#### 1. Plaintiff's Testimony

Plaintiff was born on October 19, 1960, and was 42 years old at the onset date of disability.  Plaintiff's highest level of formal education was twelfth grade and she graduated high school. (Tr. 144)  Plaintiff's past work experience includes work as a materials handler and a retail manager.  (Tr. 158, 29)   At the administrative hearing, Plaintiff testified that she last worked in December 2002.  (Tr. 61)   Plaintiff stated she quit working because of pain.  (Tr. 62, 81)  Plaintiff testified that she "couldn't deal with the pain," and that her "hands were numb," she was "dropping everything," and had "tingling" and joint pain in her neck, hip, and ankle.  (Tr. 81)   Plaintiff testified that she couldn't button her clothes or do her hair.  (Tr. 82-83)   Plaintiff testified that she even-tually underwent neck surgery to relieve a pinched nerve.  (Tr. 83)  Plaintiff testified she was "depressed" after being diagnosed with arthritis and hepatitis C.  (Tr. 83)   Plaintiff explained that she was "isolated," kept to herself, and stopped "hanging out with friends," and attending "family functions."  (Tr. 83)   Plaintiff testified that she lived with her god-daughter after she stopped working in December 2002. (Tr. 86)

#### 2. Medical Expert's Testimony

David McIntyre, M.D., testified at the December 14, 2006 administrative hearing. (Tr. 62-81)  Dr. McIntyre testified that the record contained insufficient evidence to show that Plaintiff had a medically determinable mental impairment of depression or anxiety prior

to March 1, 2004. (Tr. 76-78) Dr. McIntyre testified that the low doses of Elavil and Valium prescribed in 2002 by Plaintiff's treating physicians did not alone provide conclusive evidence that Plaintiff suffered from anxiety or depression because those medications are often prescribed for medical conditions or pain disorder, rather than a psychiatric condition. (Tr. 73-74) Dr. McIntyre further opined that, although notes by Plaintiff's treating physician indicated increased anxiety in November 2002, the progress notes show no evidence or describe the degree of anxiety or depression. (Tr. 76-78)

Dr. McIntyre testified that Dr. Huddleston's June 1, 2004 psychological evaluation demonstrates that Plaintiff's mental condition had worsened considerably. (Tr. 75-76) According to Dr. McIntrye, as of March 1, 2004, Plaintiff's depression caused marked limitations in her ability to concentrate. (Tr. 67-68)

### D. Five-Part Analysis and ALJ's Findings

### 1. Sequential Test for Evaluating Disability

As the claimant, Plaintiff bears the initial burden of proving that she is disabled within the meaning of the Social Security Act (the "Act"). *See* 42 U.S.C. § 423 (d)(5); *Ukolov v. Barnhart*, 420 F.3d 1002, 1004 (9th Cir. 2005); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Work is defined in terms of an eight hour day, five days a week, on a regular and continuous basis. Social Security Ruling 96-8p (Appendix 1)

The Commissioner has established a five step sequential evaluation process for determining whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. §

404.1520, § 416.920. Step one determines if the claimant is performing substantial gainful activities. If so, benefits are denied. 20 C.F.R. § 404.1520(a)(4), § 416.920(a)(4). If not, the ALJ proceeds to step two and determines whether claimant has a medically severe impairment or combination thereof. 20 C.F.R. § 404.1520(a)(4)(ii), § 416.920(a)(4)(iii). If claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step, which compares claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(iii), § 416.920(a)(4)(iii). If the impairment meets or equals one of the listed impairments, claimant is conclusively presumed to be disabled. If the impairment is not conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment prevents plaintiff from performing work which was performed in the past. At this step, a claimant's residual functional capacity ("RFC") assessment is considered. If a claimant is able to perform previous work, claimant is deemed not disabled. 20 C.F.R. § 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If claimant cannot perform previous work, the fifth and final step in the process determines whether claimant is able to perform other work in the national economy in view of claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v), and § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 - 41 (1987).

The claimant bears the burden of proof at steps one through four to establish a *prima facie* case of entitlement to disability benefits. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). The initial burden is met once claimant establishes a physical or mental impairment prevents the performance of previous work. At step five, the burden shifts to the Commissioner to show that (1) claimant can perform other substantial gainful activity, and (2) a significant number of jobs exist in the national economy which plaintiff can perform. *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984); *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).

## 2. The ALJ's Findings

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since the December 5, 2002 onset date. (Tr. 31) At step two, the ALJ found that prior to March 1, 2004, the medical evidence established that Plaintiff had the following severe impairments: "chronic hepatitis C, borderline intellectual functioning, and rheumatoid arthritis." (Tr. 31) At step three, the ALJ found that prior to March 1, 2004, the severity of Plaintiff's medically determinable impairments did not alone or in combination, medically meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. (Tr. 31).

The ALJ found that Plaintiff's "allegations regarding her pain and limitations and their impact on her ability to work prior to March 1, 2004, were not totally credible." (Tr. 32) At step four, the ALJ concluded that prior to March 1, 2004, Plaintiff retained the residual functional capacity ("RFC") "to perform a range of light exertional unskilled" work. (Tr. 30, 32) At step five, the ALJ found that prior to March 1, 2004, Plaintiff was unable to perform her past relevant work, but could perform other work existing in the national economy such as work such as an assembler, outside delivery person, and packer. (Tr. 30, 32) The ALJ found that Plaintiff was not under a disability as defined by the Act prior to March 1, 2004. (Tr. 32)

The ALJ further found that as of March 1, 2004, Plaintiff had severe impairments that included: major depressive disorder, chronic hepatitis C, borderline intellectual functioning, rheumatoid arthritis, alcohol dependence, and status post-cervical fusion. (Tr. 32) The ALJ concluded that as of March 1, 2004, the severity of Plaintiff's major depressive disorder met the criteria of Listing 12.04 of Appendix 1, Subpart P, Regulations No. 4 (Tr. 32) The ALJ found that Plaintiff had been under a disability since March 1, 2004 and that her disability continued through the date of the decision. (Tr. 33)

As discussed below, only the ALJ's finding that Plaintiff was not disabled under the Act before March 1, 2004 is at issue.

**IV. Issues and Analysis**

Plaintiff challenges the Commissioner's decision on two main grounds: (1) the

ALJ erred at step three of the sequential evaluation process by finding that, prior to March 1, 2004, Plaintiff did not suffer from an impairment that meets or equals the severity of requirements of an impairment listed in Appendix 1 Subpart P of regulation number 4; and (2) the ALJ erred in denying benefits at step five of the sequential evaluation process. (docket # 19)  Plaintiff requests that the Court remand for an award of benefits.  The Commissioner's response focuses on step five of the sequential analysis.[1]  The Commissioner argues that no error occurred at step five because: (1) the ALJ provided specific and legitimate reasons for rejecting a controverted medical source opinion; (2) the ALJ gave specific and legitimate reasons for rejecting Plaintiff's subjective complaints; (3) the ALJ provided germane reasons for discounting the written statements of a lay witness; (4) substantial evidence supports the ALJ's assessments of Plaintiff's residual functional capacity prior to March 1, 2004; and (5) substantial evidence supports the ALJ's finding that Plaintiff could perform other work.  (docket # 25)  The Court will address these issues below.

**A.  Step Three of the Evaluation Process**

Plaintiff first argues that the ALJ erred at step three of the evaluation process by concluding that Plaintiff did not suffer from an impairment that meets or equals the severity requirements of an impairment listed in the regulations.  (docket # 19 at 18)  Plaintiff argues that she should prevail at step three of the evaluation process and, therefore, the Court need not consider the Commissioner's arguments regarding steps four and five of the analysis.  The Court disagrees.  As discussed below, Plaintiff has not shown that the ALJ erred at step three of the evaluation process.

If an individual's impairments meet or equal the severity requirement of an impairment listed in Appendix 1, Subpart P of Regulation No. 4, disability is established and

_____

[1]  As Plaintiff notes, the Commissioner's response does not address Plaintiff's arguments regarding the step three determination.  The Commissioner's omission, however, does not prevent review of this issue or relieve Plaintiff of her burden at steps one through four of the sequential evaluation process to prove that she is disabled under the Act, or otherwise alter the relevant standard of review. 42 U.S.C. § 423(d)(5); § 405(g).

the sequential evaluation process ends. 20 C.F.R. § 404.1520(d). Plaintiff argues that her impairments meets or equals the Listing 12.05(C), 20 C.F.R. § 404.1520(d). The 12.05(C) Listing describes mental retardation as a condition characterized by

> significantly subaverage intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e. ... before the age of 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied . . .

> C. A valid verbal, performance, or full-scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Thus, Listing 12.05(C), requires an ALJ to find that a claimant satisfies three elements: (1) a valid verbal performance, or full scale IQ score of 60 through 70; (2) a physical or other mental impairment; and (3) subaverage intellectual functioning with evidence of adaptive functioning deficits that manifested themselves before the age of 22. *Id.*

Plaintiff argues that neither the ALJ nor Defendant dispute Plaintiff's IQ of 69 diagnosed by consulting psychologist Dr. Huddleston. (docket # 19 at 18, citing Tr. 25, 483) Plaintiff also argues that both the ALJ and Defendant agree that Plaintiff suffered several severe impairments including borderline intellectual functioning, chronic hepatitis C, and rheumatoid arthritis, during the relevant period. (dockets # 19 at 19, # 31 at 3, citing Tr. 31) Thus, Plaintiff contends that she meets the first two requirements of Listing 12.05(C) and the only remaining issue is whether the evidence demonstrates deficits in adaptive functioning initially manifesting during the developmental period (e.g., before age 22). The Court agrees that Plaintiff satisfied the first two components of Listing 12.05(C). The remaining issue is whether Plaintiff has "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested . . . before the age of 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1. Although the Ninth Circuit has not spoken on what satisfies this requirement, other circuits have found IQ to be an important indicator of subaverage intellectual functioning.

As Plaintiff notes, the Eleventh Circuit has found that claimants create a rebuttable presumption that their developmental IQ was the same as their current IQ when they present a valid IQ score from their post-developmental period. *Hodges v. Barnhart*, 276 F.3d 1265, 1268 (11th Cir. 2001). In *Hodges*, the Eleventh Circuit noted that "other appellate courts have recognized this presumption finding that IQ's remain fairly constant throughout life." *Id.*; also see *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985) (absent contrary evidence, an IQ test taken after the insured period correctly reflects claimant's IQ during the insured period); *Luckey v. U.S. Dep't. of Health & Human Srvs.*, 890 F.2d 666, 668-69 (4th Cir. 1989) (courts should assume IQ remains constant and that an absence of an IQ test during the developmental period does not preclude a finding of retardation); *Guzman v. Bowen*, 801 F.2d 273, 275 (7th Cir. 1986) (*per curiam*) (IQ test taken after expiration of insured period sufficient to establish IQ during insured period); *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001) (presuming that a person's IQ remains stable over time in the absence of any change in intellectual functioning); *but see Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (upholding ALJ's finding that claimant was not retarded, in part because plaintiff's IQ testing was not contemporaneous with her developmental period); *Markle v. Barnhart*, 324 F.3d 182, 188 (3d Cir. 2003) (declining to create such a presumption).

Courts that rely on evidence of mental retardation from the post-developmental period to create a rebuttable presumption that the condition existed during the developmental period implicitly base their decision on the medical fact that, absent some traumatic event, intelligence remains fairly constant throughout one's life. *Hodges*, 276 F.3d at 1268-69. The Eleventh Circuit has gone further to find that claimants presumptively meet the 12.05(C) disability requirements when they present a valid IQ score and evidence of an additional impairment. *Id.*

The record in this case contains no evidence regarding Plaintiff's IQ before she turned 22. (Tr. 24-25) Relying on *Hodges,* Plaintiff argues that in the absence of such evidence, Plaintiff's IQ score at age 45 creates a rebuttable presumption of a fairly constant IQ throughout her life. (docket # 19 at 19) Plaintiff argues that the ALJ did not properly

apply the presumptions when evaluating Plaintiff's claims.  Plaintiff states that the ALJ found that there was no evidence of a low IQ prior to age 22, and that the existence of a low IQ prior to age 22 was rebutted by Plaintiff's ability to complete high school, read and write, and pass a driver's license test.  (Tr. 25)  Plaintiff argues that those factors do not rebut the presumption of impaired intellectual functioning prior to age 22.  In support of this argument, Plaintiff cites the testimony of Defendant's medical expert, Dr. McIntryre, that in some instances, individuals can be "pushed through" high school and graduate despite an IQ of 70. (Tr. 69-70)

Plaintiff's argument ignores several other findings of the ALJ and other record evidence which supports the ALJ's conclusion that Plaintiff's impairments did not meet or equal the criteria of Listing 12.05(C).  (Tr. 25)  The ALJ found that the evidence supported the opinion of Dr. McIntyre, the mental health expert who testified at the administrative hearing, that the severity of Plaintiff's borderline intellectual functioning did not meet or equal the criteria of any of the listed impairments.  (Tr. 24-25)  In support of this conclusion, the ALJ considered Plaintiff's psychological evaluation with James E. Huddleston, Ph.D. in September of 2006.  (Tr. 25, citing Exhibit 22F)  At the evaluation, Plaintiff earned a "full-scale IQ score of 69, a performance IQ score of 70 and a verbal IQ score of 73 on the Weschler Adult Intelligence Scale-Third Edition."  (Tr. 25)   Dr. Huddleston diagnosed Plaintiff with "borderline intellectual functioning rather than mental retardation based on her high level of adaptive functioning."  (Tr. 25)   The ALJ noted that Dr. McIntyre concurred in Dr. Huddleston's finding that a diagnosis of mental retardation was not supported by the record.  (Tr. 25)

The ALJ also considered Dr. McIntyre's testimony that "an IQ score of 70 is the 'cut off' point for a diagnosis of mental retardation" and that "with any intelligence test there is always a standard error of measurement."  (Tr. 25)   Thus, "a score of 69 may actually be as high as 72 or as low as 66." (Tr. 25) Dr. McIntrye further explained that because Plaintiff's full-scale IQ score of 69 was on the edge of the cutoff for diagnosing mental retardation, "a doctor must look carefully at the claimant's adaptive functioning."  (Tr. 25)

Dr. McIntrye opined that "in this case [Plaintiff's adaptive functioning] shows clearly that a diagnosis of mental retardation is not supported." (Tr. 25)

When determining whether a claimant demonstrates deficits in adaptive functioning, courts consider a variety of factors that focus on a claimant's ability to lead an independent life. The Third and the Eighth Circuits have found that "a claimant's participation in special education classes, poor academic performance, and low-skilled work history imply evidence of deficits in adaptive functioning during the developmental period." *Walberg v. Astrue*, 2009 WL 1763295, * 9 (W.D. Wash., June 18, 2009) (citing *Markle v. Barnhart*, 324 F.3d 182,189 (3rd Cir. 2003) and *Christner v. Astrue*, 498 F.3d 790, 793 (8th Cir. 2007)). These factors are consistent with the Commissioner's comments on the Listing requirements for 12.05(C). 20 C.F.R. Pt. 404. In this case, the ALJ considered that Plaintiff "attended a regular high school," had "no history of special education services or any other specialized programs," obtained a high school diploma, "is able to read and write", and passed a "written test for her driver's license." (Tr. 25) These factors are evidence of adaptive functioning. Plaintiff testified at the administrative hearing that she graduated from high school and that she did not take any special education classes. (Tr. 61) Plaintiff also testified that she can read and write and that she passed a written test to get her driver's license. (Tr. 61) Additionally, the record includes a "Disability Report -Form SSA 3368" which indicates that Plaintiff's longest held job was as a material handler from 1988-2003. (Tr. 140) Plaintiff's job as a material handler was a forty-hour-per-week position, and required the used of "technical knowledge or skills." (Tr. 140) Additionally, Plaintiff's job involved writing, such as "complet[ing] reports," and Plaintiff spent "half" of her time supervising 20 people. (Tr. 141) A Work History Report completed on October 3, 2003, includes similar information regarding Plaintiff's work history. (Tr. 158-165) Plaintiff's education and work history provide substantial evidence in support of the ALJ's finding that Plaintiff "had no deficits in her adaptive functioning prior to age 22." (Tr. 25) *Walberg v. Astrue*, 2009 WL 1763295 (W.D. Wash. 2009) (finding that ALJ erred in finding that claimant's impairment did not meet Listing 12.05(C) where she attended special education

classes, dropped out of school in eleventh grade, was unable to hold a job, had no past relevant work, and had lifetime earnings of less than $19,000.). The record contains substantial evidence supporting the ALJ's findings regarding these factors. *Markle*, 324 F.3d at 189.

Review of the record, including the ALJ's analysis and findings, establish that substantial evidence supports the ALJ's conclusion that Plaintiff's impairments, when combined with her IQ, do not medically equal mental retardation under Listing 12.05(C). The ALJ's determination at step three of the evaluation process is supported by substantial evidence and is free from legal error, accordingly, this Court must affirm the Commissioner's determination at step three. *Tackett*, 180 F.3d at 1097; 42 U.S.C. § 405(g). The Court will next consider Plaintiff's argument that the ALJ erred at step five of the sequential analysis.

**B. Step Five**

At step four, the ALJ found that Plaintiff cannot perform her past work. (Tr. 32) After a claimant has demonstrated that she has a severe impairment that prevents her doing her past relevant work, she has made a *prima facie* showing of disability. *Tackett*, 180 F.3d at 1100-01. The burden then shifts to the Commissioner to show that, in view of claimant's RFC, age, education, and work experience, she can perform other types of work that exist in "significant numbers" in the national economy. *Id*.; 20 C.F.R. § 404.1560(b)(3).

Plaintiff argues that this burden was not met because the "ALJ [did] not demonstrate a proper weighing of the treating and consulting physician opinion evidence, and [did] not properly consider subjective complaint testimony, and [did] not properly consider third party function reports." (docket # 19 at 21) The Court will consider these issues below.

**1. Weight Assigned to Physicians' Opinions**

Title II's implementing regulations distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physician); (2) those who examine but do not treat claimant (examining physician); and (3) those who neither treat nor examine the claimant (non-examining physician). 20 C.F.R. § 404.1527(d). Ordinarily, the opinion of a treating or examining doctor is given more weight than the opinion of a nonexamining

source. 20 C.F.R. §§ 404.1527(d)(1),(2); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996)(as amended); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). If a treating or examining physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, that physician's opinion is given controlling weight. 20 C.F.R. § 404.1527(d)(2); Social Security Ruling (SSR) 96-2p; *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). However, "the treating physician's opinion. . . is not necessarily conclusive as to either a physical condition or to the ultimate issue of disability." *Magallanes*, 881 F.2d at 751. If a treating physician's opinion is "brief and conclusionary in form with little in the way of clinical findings to support [its] conclusion," an ALJ need not accept it. *Id.* An ALJ may not reject a treating physician's opinion unless the ALJ "makes findings setting forth specific legitimate reasons for doing so that are based on substantial evidence in the record." *Smolen*, 80 F.3d at 1285. If the treating physician's opinion is uncontroverted, the ALJ's reasons for rejecting the opinion must be clear and convincing. *Id.* As discussed below, the Court concludes that the ALJ properly assessed the opinions of treating, examining, and non-examining physicians and assigned those opinions appropriate weight.

Plaintiff argues that the ALJ erred in rejecting the September 2003 opinion of treating primary physician Dr. Verdejo-Perez that Plaintiff's rheumatoid arthritis precluded the performance of substantial gainful activity. (Tr. 382; docket # 19 at 22-23) Contrary to Plaintiff's argument, the ALJ properly rejected Dr. Verdejo-Perez' opinion.

In rejecting Dr. Verdejo-Perez' opinion, the ALJ properly noted that the conclusion that Plaintiff cannot perform substantial gainful employment is reserved to the Commissioner. SSR 96-5p. The opinion of Dr. Verdejo-Perez regarding Plaintiff's ability to work does not constitute "medical opinion." *See* 20 C.F.R. § 416.927(a)(2) & (e). Although, as Plaintiff argues, a treating physician's opinion as to disability has evidentiary value, it "is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Batson v. Commissioner of Social Security*, 359 F.3d 1190, 1195 (9th Cir. 2004); 20 C.F.R. § 404.1527(e)(1) & (3) (stating that "[w]e are

responsible for making the determination or decision about whether you meet the statutory definition of disability . . . A statement by a medical source that your are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").

The ALJ also found that Dr. Verdejo-Perez' opinion was not supported by his own evaluations of Plaintiff, which showed minimal abnormal clinical findings. (Tr. 26, 29; Tr. 385-390) An ALJ may reject a treating physician's opinion that is not supported by the treatment records. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by the clinical findings.").

The ALJ also noted that Dr. Verdejo-Perez' opinion was "not consistent with the objective evidence prior to March 1, 2004." (Tr. 29) For example, although Plaintiff tested "seropositive" for rheumatoid arthritis in July of 2003, an x-ray of Plaintiff's right hand taken in July 2003 showed "minimal chondrocalcinosis in the radioscaphoid region versus an old avulsion injury. Otherwise negative hand." (Tr. 223) X-rays of Plaintiff's left hand taken in July 2003 revealed a "small cyst . . . in the proximal pole of the scaphoid." (Tr. 223) The findings for the left hand indicated that "joint spaces are well maintained. There are no erosive changes. No joint swelling is seen." (Tr. 223) X-rays of Plaintiff's right foot showed "minimal degenerative changes of the talonavicular joint" and were otherwise normal. (Tr. 223) Results of x-rays of Plaintiff's left foot were normal. (Tr. 224) Further, in June 2003, Dr. Gluck, a rheumatologist, examined Plaintiff and reported abnormal findings limited to puffiness in the proximal interphalangeal joints, metacarpophalangeal joints, knees, and ankles. (Tr. 216) In July 2003, Dr. Gluck's Physicians Assistant, Scott Brown, examined Plaintiff and noted "mild nontender synovitis" in the wrists, metacarpophalangeal joints ("MCPs") and proximal interphalangeal joints ("PIPs"), as well as in the ankles and MTP's. The examiner further noted "minimal synovitis" in the knees, and that Plaintiff had a weak grip bilaterally. (Tr. 213)

A treating physician's opinion is given controlling weight only when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is

consistent with all other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188; 20 C.F.R. § 404.1527(d)(3) (the weight given a medical source opinion is proportional to the degree to which it is supported with medical signs and laboratory findings.); *Batson*, 359 F.3d at 1195 (ALJ properly rejected opinion of treating physicians as they "lacked substantive medical findings to support her conclusion."); *Thomas v. Barnhart*, 278 F.3d 948, 957 (9th Cir. 2002) (treating physician's opinion may be rejected if unsupported by doctor's examination record).  The ALJ noted that Dr. Verdejo-Perez, a primary care physician, is not a rheumatologist and that Plaintiff's "rheumatologist did not endorse her allegations of disabling pain and limitations."  (Tr. 29, 211-224)  20 C.F.R. § 404.1527(d)(4) (opinion of a specialist regarding issues related to area of his specialty generally given more weight than opinion of non-specialist). Contrary to Plaintiff's assertion, the ALJ did not improperly reject Dr. Verdejo-Perez' opinion because he was not a specialist, rather, the ALJ gave more weight to the opinion of the specialist, Dr. Gluck, when compared to that of Dr. Verdejo-Perez. Based upon this observation, and in view of the lack of objective evidence supporting Dr. Verdejo-Perez' opinion, the ALJ concluded that Dr. Verdejo-Perez' opinion was unsupported by the evidence as a whole.  (Tr. 29)  This finding is free from legal error and supported by substantial evidence in the record.

In rejecting Dr. Verdejo-Perez' opinion, the ALJ further noted that she gave "substantial weight to the State Agency medical consultants who reviewed the claimant's file and determined the claimant's physical and mental residual functional capacity . . . ."  (Tr. 29)  The ALJ cited hearing exhibits 15F and 16F.  (Tr. 29)  Hearing exhibit 15F contains the residual functional capacity assessment completed by State Agency physician, Frank Shallenberger, M.D.  (Tr. 4, 363-375)  The ALJ apparently cited hearing exhibit 16F in error because that exhibit contains the opinion of treating physician Dr. Verdejo-Perez, which the ALJ rejected.  (Tr. 29, Tr. 380-81)  Rather, the ALJ most likely intended to cite to hearing exhibit 14F, which contains the residual functional capacity assessment of State Agency psychiatrist, Paul Tangeman, Ph.D.  (Tr. 3, 361-64).

Dr. Tangeman reviewed the clinical findings in evidence on June 25, 2004 and

found that, taken as a whole, prior to March 1, 2004, there was insufficient evidence in the record to support a finding that Plaintiff's mental impairment precluded performance of unskilled work. (Tr. 363) State Agency physician, Dr. Shallenberger, reviewed the clinical findings on June 28, 2004 and found that, taken as a whole, the evidence supported a finding that Plaintiff retained the residual functional capacity to perform a limited range of light work. (Tr. 372-73) The opinions of these State Agency physicians constitute substantial evidence in support of the ALJ's findings. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

In summary, the ALJ sufficiently explained her reasons for not giving deference to the opinions of the treating physician Verdejo-Perez which were inconsistent with other substantial evidence in the record, including the records of treating rheumatologist Dr. Gluck and the State Agency physicians, or with the Dr. Verdejo-Perez' own treatment notes. The Court finds that the ALJ did not err and that substantial evidence supports her conclusion.

## 2. Plaintiff's Subjective Complaint Testimony

The ALJ also denied Plaintiff's claims based on her conclusion that Plaintiff's "allegations regarding her pain and limitations and their impact on her ability to work prior to March 1, 2004 are not totally credible." (Tr. 32)

The Court must determine whether the ALJ properly rejected Plaintiff's subjective complaints regarding her pain and limitations. In deciding whether to accept a claimant's subjective symptom testimony, the ALJ performs a two-part analysis: (1) the *Cotton* analysis, and (2) an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (citing *Cotton v. Bowen*, 799 F.2d 1403, 1407-1408 (9th Cir. 1986)).

Under the *Cotton* test, a claimant who alleges disability based on subjective symptoms must: (1) produce objective medical evidence of an impairment or impairments; and (2) show that the impairment or combination of impairments could reasonably be expected to produce some degree of symptoms. *Smolen*, 80 F.3d at 1281-82; *Cotton*, 799 F.2d at 1407-08. The claimant need not produce objective medical evidence of the severity

of his symptoms. *Smolen*, 80 F.3d at 1281-82. Here, Plaintiff satisfied the *Cotton* test. The ALJ found that Plaintiff had "severe" impairments. (Tr. 31) The ALJ did not question the existence of a medical cause for Plaintiff's discomfort, but only the severity thereof. (Tr. 32)

Once a claimant satisfies the *Cotton* test and there is no affirmative evidence suggesting malingering,[2] the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if the ALJ makes specific findings stating clear and convincing reasons for doing so. *Smolen*, 80 F.3d at 1283-84; *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). To determine the credibility of claimant's testimony regarding the severity of her symptoms, the ALJ may consider: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. *Smolen*, 80 F.3d at 1284. The ALJ may also consider the claimant's work record, and the observations of treating and examining physicians and other third parties regarding "the nature, onset, duration and frequency of claimant's symptoms, and precipitating and aggravating factors, functional restrictions caused by the symptoms, and the claimant's daily activities." *Id.* at 1284; *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991); 20 C.F.R. § 404.1529 (2006).

Here, the ALJ provided sufficient reasons for rejecting Plaintiff's subjective complaints. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (finding that ALJ stated sufficient reasons for not fully crediting Plaintiff's pain testimony when the ALJ discussed the medical evidence and Plaintiff's daily activities.)

The ALJ noted the report of consultative examiner, Dr. McPhee, that Plaintiff moaned, groaned, and grimaced throughout the examination seemingly out of proportion to the gentle procedures. (Tr. 28, 242) The ALJ also noted that although Plaintiff used a cane, the medical record did not indicate that a cane was prescribed or otherwise recommended by

---

[2] The ALJ made no finding that Plaintiff was malingering.

Plaintiff's treating or examining physicians. (Tr. 28, 242) The ALJ also considered Dr. Verdejo-Perez' report that Plaintiff was "overly dramatic" when walking from the chair to the table during her initial visit in April 2004. (Tr. 390) The ALJ also noted Dr. McPhee's finding that manual muscle testing showed a tendency for giveaway, but no focal motor weakness. (Tr. 243) The ALJ properly concluded that the foregoing constituted evidence that Plaintiff may have exaggerated her pain and limitations. (Tr. 28) Although the ALJ gave other reasons for discrediting Plaintiff's symptom testimony, the foregoing reasons were a sufficient basis for the ALJ to reject Plaintiff's subjective complaints. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (claimant's complaints rejected because physician reported his symptoms were amplified). Additionally, the consultative examiner, Dr. McPhee, noted Plaintiff's refusal to participate in some of the examination procedures including squatting, hopping, and standing on her heels and toes. (Tr. 242-43) *Thomas*, 278 F.3d at 959 (holding that ALJ properly considered Plaintiff's self-limiting behaviors). Dr. McPhee's testimony was competent evidence upon which the ALJ could rely in determining that Plaintiff's subjective complaints were not entirely credible. *Magallanes*, 881 F.2d at 752-53 (stating that testimony of consultative medical expert constituted substantial evidence when consistent with other evidence.)

The ALJ further noted that the medical record did not support Plaintiff's claims that, prior to March 2004, she was unable to use her hands, dropped items, and could not button her clothes. (Tr. 28) Substantial evidence supports this finding including Dr. McPhee's January 2004 findings that the joints of Plaintiff's hands showed "no evidence of swelling or redness" or "other evidence of synovitis." (Tr. 243) Dr. McPhee also noted that Plaintiff could make a fist. (Tr. 243) The ALJ properly considered information from Plaintiff's medical records in assessing her credibility. 42 U.S.C. § 423(d); 20 C.F.R. § 404.1529(c)(1)&(2) (requiring consideration of medical history, medical signs, and laboratory findings, and objective medical evidence in evaluating the extent and impact of alleged pain); *Batson*, 359 F.3d at 1196 (holding that ALJ properly relied on objective medical evidence and medical opinions in determining credibility).

In assessing Plaintiff's subjective allegations, the ALJ also considered nonmedical evidence. (Tr. 28) 20 C.F.R. § 416.929(c)(3) & (c)(4). Specifically, the ALJ noted that Plaintiff "had a regular exercise habit and had no difficulty with exercising." (Tr. 28) *Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992) (stating that claimant's activity level is relevant to assessing subjective complaints.); *Rollins*, 261 F.3d at 857 (stating that "[i]t is true that Rollins's testimony was somewhat equivocal about how regularly she was able to keep up with all of these activities, and the ALJ's interpretation of her testimony may not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second guess it.").

The Court finds that the ALJ made sufficient specific findings providing clear and convincing reasons for discounting Plaintiff's testimony regarding the severity of her symptoms. The ALJ properly considered Plaintiff's daily activities and the observations of treating and examining physicians. The evidence set forth above sufficiently supports the ALJ's conclusion that Plaintiff's allegations of a complete inability to work were not entirely credible. *Rollins*, 261 F.3d at 857.

**3. Lay Witness Testimony**

Plaintiff also argues that the ALJ failed to properly consider the third party questionnaire completed by a lay witness, her friend Janet Riggins. (docket # 19 at 30) The ALJ must consider third-party reports as part of the disability evaluation process. 20 C.F.R. § 404.1513(d)(4). The Ninth Circuit has held that the ALJ must consider the testimony of friends and family members. *Smolen*, 80 F.3d at 1288. However, the ALJ may reject the testimony of a lay witness if she provides specific reasons for doing so. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Id.* (citing *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996)). In this case, the ALJ gave such reasons for rejecting the opinion of Janet Riggins. The ALJ noted that Ms. Riggins wrote her statement about Plaintiff's limitations on May 30, 2004, only one month after Plaintiff's

cervical surgery and thus, it "would be expected that [Plaintiff] required more care and had more pain at that time." (Tr. 29, 179-87) The ALJ noted that there was no indication in the record that Plaintiff had the pain and limitations described in the lay witness' statement prior to Plaintiff's April 2004 surgery. (Tr. 29) Thus, the ALJ concluded that the lay witness statement did not provide evidence that Plaintiff's residual functional capacity was less than what the ALJ had assessed prior to March 1, 2004. (Tr. 29)

The record supports the ALJ's conclusion. On May 30, 2004, Janet Riggins completed a form entitled "Function Report Adult - Third Party." (Tr. 179) Riggins indicated that she had known Plaintiff for 16 years and was spending about 60 hours a week with her. (Tr. 179) Riggins stated that she helps Plaintiff bathe and dress. (Tr. 179) Riggins noted in several different sections of the form that Plaintiff's activities - including driving, cooking, and caring for her hair - are limited because she had surgery on her neck and cannot move her neck and because of Plaintiff's R.A. (rheumatoid arthritis). (Tr. 180-182) Riggins also completed a section entitled "Information About Abilities" in which she indicated that Plaintiff was limited in most of the activities listed - "lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, memory, stair climbing, using hands, concentration, understanding, following instructions, getting along with others" - "due to her neck surgery and R.A." (Tr. 184) Although, as Plaintiff notes, Riggins attributed Plaintiff's limitations both to her surgery and to her rheumatoid arthritis, the form does not indicate to what extent the identified pain and limitations were present before the April 2004 surgery. The ALJ's conclusion that Plaintiff experienced increased pain following her surgery in April 2004 was reasonable. In view of the numerous references in the form completed by Ms. Riggins to Plaintiff's April 2004 neck surgery, the ALJ's rejection of Ms. Riggin's opinion as evidence of Plaintiff's pain and limitations before March 1, 2004 was reasonable and the ALJ provided specific reasons for rejecting Ms. Riggins' opinion. *Lewis*, 236 F.3d at 511. To the extent statements in the form completed by Ms. Riggins were ambiguous because of her attribution of Plaintiff's pain and limitations to both Plaintiff's rheumatoid arthritis and neck surgery, the Court defers to the ALJ's evaluation of such evidence. *Burch*, 400 F.3d at 679.

### 4. Residual Functional Capacity Assessment

Finally, Plaintiff argues that the ALJ's residual functional capacity ("RFC") assessment is not supported by substantial evidence. (docket # 19 at 31) The RFC assessment is based on all of the relevant evidence in the case's record, including medical history, medical signs and laboratory findings, reports of daily activities and medical source statements - including the findings and opinions of treating, examining, and/or reviewing physicians. 20 C.F.R. § 404.1545. Claimant, not the ALJ, bears the burden of proof on RFC. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987); 20 C.F.R. §§ 404.1520(a), (e), (f); 404.1545-46; 404.1560-61.

In this case, the ALJ properly credited the functional limitations that were supported by the evidence, which resulted in the ALJ's determination that, prior to March 1, 2004, Plaintiff retained the "residual functional capacity to perform a range of light exertional unskilled light work." (Tr. 28) The ALJ specifically found that Plaintiff

> can lift or carry 20 pounds occasionally and 10 pounds frequently, stand/walk for a total of 5 hours in an 8-hour day and sit for a total of 6 hours in an 8-hour day. She has a limited ability to push and/or pull with her upper extremities. She is limited to only occasional reaching above shoulder height and bending at the waist. She can engage in only occasional climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling. She is precluded from climbing ladders/ropes/scaffolds. She was unlimited [in] gross manipulation, fine manipulation and feeling.

(Tr. 28)

In assessing Plaintiff's RFC, the ALJ found that the treatment records did not support Plaintiff's allegations of pain and fatigue due to hepatitis C. (Tr. 27) As the ALJ noted, the record indicates that Plaintiff did not obtain any treatment specifically for hepatitis C. (Tr. 27) The ALJ also noted that on examination by rheumatologist Dr. Gluck, "abnormal clinical findings were limited to puffiness" in various joints. (Tr. 26-27, Tr. 211-224). The ALJ observed that prior to March 1, 2004, there was no objective or clinical evidence of any pain or radiculopathy. (Tr. 27) These findings are supported by the record, including the treatment notes of Dr. Gluck and his Physicians Assistant, Scott Brown, and by Dr. McPhee's report. (Tr. 242-43, 213)

- 27 -

The ALJ also considered the January 2004 opinion of consultative examiner, Dr. McPhee. (Tr. 28)  As the ALJ notes, Dr. McPhee opined that Plaintiff was limited to standing/walking for only 2 hours out of any 8-hour day.  (Tr. 28, 242 )  The ALJ rejected the opinion regarding standing/walking because it was not supported by any clinical findings prior to March of 2004.  (Tr. 28)  The ALJ also explained that Dr. McPhee's opinion was "out of proportion with the evidence given Dr. McPhee's observation that the claimant appeared to exaggerate her pain." (Tr. 27-28)  This finding is supported by substantial evidence including Dr. McPhee's notation that Plaintiff refused to participate in some examination procedures, and that Plaintiff moaned and groaned out of proportion to the gentle examination procedures.  (Tr. 242-43)

The ALJ also noted the opinion of the testifying medical expert, Dr. McIntrye, who testified that the record contained insufficient evidence to show that Plaintiff had a medically determinable impairment of depression or anxiety prior to March 1, 2004. (Tr.  30, 76-78)  The ALJ reasonably relied upon the testimony of this medical expert. *Tonapetyan v. Massanari*, 242 F.3d 1144, 1147 (9th Cir. 2001).

As previously noted, State Agency physician, Dr. Tangeman, Ph.D, reviewed the clinical findings in the record on June 25, 2004, and found that, considered as a whole, before March 1, 2004, there was insufficient evidence in the record to support a finding that Plaintiff's mental impairment precluded performance of unskilled work.  (Tr. 363)   This constituted substantial evidence.  *Andrews*, 53 F.3d at 1041.  State Agency physician, Dr. Shallenberger, reviewed the clinical findings on June 28, 2004 and found that, taken as a whole, the evidence supported a finding that Plaintiff retained the residual functional capacity to perform a limited range of light work. (Tr. 372-373)  This constituted substantial evidence.  The ALJ reasonably relied upon the opinions of the State Agency physicians and the testifying medical expert to conclude that Plaintiff could perform unskilled light work prior to March 1, 2004. (Tr. 33, 35); *Andrews* 55 F.3d at 1041.

Plaintiff argues that the ALJ erred because she relied upon the normal x-ray findings in concluding that Plaintiff had unlimited gross manipulation, fine manipulation, and feeling.

(docket # 19 at 31; Tr. 32) Plaintiff argues that, in the case of arthritis, x-rays may not show any abnormalities in the first three to six months. (docket # 19 at 32) However, because Plaintiff complained of, and was diagnosed with, arthritis as early as 1996, Tr. 215, x-rays from 2003 which did not show evidence of arthritis support the ALJ's findings. Plaintiff also argues that the ALJ's reliance on the x-ray evidence was misplaced because a diagnosis of rheumatoid arthritis is based on subjective symptoms and physical examination findings such as warmth, swelling, and pain in the joints along with certain blood levels. (docket # 19 at 31) Plaintiff's discussions regarding how rheumatoid arthritis is diagnosed are not relevant to the issue in this case. The ALJ found that Plaintiff suffered from rheumatoid arthritis. (Tr. 32) However, based on the ALJ's consideration of the record, which included the normal x-ray findings, the opinions of the state agency reviewing consultants, and a medical expert, she concluded that Plaintiff retained the residual functional capacity to perform light work prior to March 1, 2004. (Tr. 27-29, 211-224, 367) The record included findings by rheumatologist Dr. Gluck in 2003 that Plaintiff has only "mild nontender synovitis" in the joints of Plaintiff's hands. (Tr. 213) Dr. McPhee similarly noted that there was no swelling or redness in the joints of Plaintiff's hands or other evidence of synovitis. (Tr. 243)

Plaintiff also argues that the ALJ ignored evidence that Plaintiff had a "hospital emergency room" visit for painful joints, left flank pain, numbness in the right arm, and all over pain. (docket # 31 at 4) Plaintiff fails to mention, however, that Plaintiff visited the emergency room in September 2003 primarily because her government prescription drug benefits had expired and she was trying to get her prescriptions filled. Specifically, on September 4, 2003, Dr. Verdejo-Perez treated Plaintiff for back pain, joint pain, and "all over" soreness. Dr. Verdejo-Perez diagnosed rheumatoid arthritis, carpal tunnel syndrome, hepatitis C, and "depression." (Tr. 387) Dr. Verdejo-Perez prescribed several medications. (Tr. 387) Plaintiff was unable to fill those prescriptions because her "AHCCCS" had expired. (Tr. 238) Thus, that same day - September 4, 2003, Plaintiff went to the emergency room at Chandler Regional Hospital hoping to receive pain medication for painful joints, left flank pain, numbness in the right arm, and all over pain. (Tr. 226, 238) A physical

examination revealed joint stiffness, with "slight swelling" at all joints, mainly in the wrists, elbows, knees, and ankles. (Tr. 236) Plaintiff also had tenderness to palpation over most of the upper extremity joints. (Tr. 38) The examining physician noted that Plaintiff ambulated with a slow, cautious gait. (Tr. 228) Plaintiff was diagnosed with "exacerbation of rheumatoid arthritis" and was advised to obtain follow-up treatment with her regular doctor. (Tr. 226-239) Although the emergency visit is further evidence that Plaintiff suffered from rheumatoid arthritis and had some pain associated therewith, Plaintiff exaggerates the significance of that visit. Plaintiff was not prompted to go to the emergency room by severe or unusual pain, rather, she simply needed to fill her prescriptions for medication she was already taking. Moreover, the emergency room examiner's notes do not indicate that Plaintiff was unable to perform substantial gainful activity.

Plaintiff further argues that the ALJ isolated medical evidence and improperly identified a date on which her cervical stenosis became disabling without the aid of a medical expert. (docket # 19 at 32-33) Again, Plaintiff's contention lacks merit. Based upon the report of Dr. Huddleston, and the opinion of the state agency reviewing consultant, the ALJ found that Plaintiff became disabled as of March 1, 2004, because her mental impairment worsened and, as a result, the severity of Plaintiff's major depressive disorder met the criteria of Listing 12.04 Appendix 1, Subpart P, Regulations No. 4. (Tr. 30-32, 333, 363) The ALJ did not find that Plaintiff's cervical impairment became disabling. (Tr. 31-32) Plaintiff's argument is not relevant to the ALJ's decision.

After determining that, in view of Plaintiff's residual functional capacity, Plaintiff could not perform her past relevant work, the ALJ properly consulted a vocational expert to determine whether Plaintiff could perform other work existing in the economy. *Bowen v. Yuckert*, 607 S.Ct. 2287, 2294 n. 5 (1987); *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). In response to the ALJ's hypothetical, which included the residual functional capacity assessed by the ALJ, the vocational expert testified that such a hypothetical individual could perform work as an assembler, a deliverer, and a packer. (Tr. 89) The vocational expert's testimony constitutes substantial evidence. *Osenbrock*, 240 F.3d at 1163-64 (holding that

ALJ may rely upon the testimony of a vocational expert.

Plaintiff contends that the ALJ erred in finding that she could perform other work prior to March 1, 2004, because the hypothetical questions posed to the vocational expert did not include relevant functional limitations. (docket # 19 at 33)  The ALJ was not required to entertain more restrictive hypothetical questions based upon Plaintiff's testimony or the opinions of her treating physicians because the ALJ properly discounted that testimony and medical source opinion.  Furthermore, substantial evidence supported the key question posed to the vocational expert.  *Magallenes*, 881 F.2d at 756.

## V.  Conclusion

For the reasons set for above, the Court finds that the Commissioner's decision is free from reversible legal error and is supported by substantial evidence.  Accordingly, the Court affirms the Commissioner's determination.  *See* 42 U.S.C. § 405(g).

Accordingly,

**IT IS ORDERED** affirming the decision of the Commissioner and hereby dismissing Plaintiff's Complaint. The Clerk is directed to terminate this case.

Dated this 22nd day of February, 2010.

Lawrence O. Anderson
United States Magistrate Judge